Industrial Properties, Inc. v. Commissioner.
Industrial Props. v. Commissioner
Docket No. 3880.
United States Tax Court
1945 Tax Ct. Memo LEXIS 9; 4 T.C.M. (CCH) 1118; T.C.M. (RIA) 45378; December 19, 1945
*9 A bondholders' committee, representing practically all of owners of bonds of defaulting debtor corporation, bid in properties at foreclosure sales pursuant to plan of reorganization, and transferred properties to petitioner, a new company organized by the committee, in exchange for its voting stock which was distributed to bondholders. Held, basis for computing gain or loss and depreciation is cost to predecessor corporation. Thomas M. Harman, Esq., 1759 Union Commerce Bldg., Cleveland 14, O., for the petitioner. Cecil H. Haas, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the various tax liabilities of the petitioner for the respective years, as follows: Tax
1937
1939
1940
1941
Income
$8,939.28
$494.43
$597.18
$1,217.00
Excess profits
6,157.89
Declared value
excess profits
3.80
*10 The only question now at issue is the proper cost basis to the petitioner of various properties acquired by it in foreclosure sales, for computing gain or loss and depreciation. The answer to this question rests on whether or not a plan of adjustment, dated July 1, 1933, and a consequent agreement dated June 11, 1934, together with the acts of the bondholders protective committee performed pursuant thereto, constituted a reorganization within the terms of the statute. Findings of Fact Certain facts were stipulated. The portions thereof material to the issue are as follows: The petitioner is a corporation organized on or about June 5, 1934, under and pursuant to the laws of the State of Ohio, and its principal office is in Cleveland, Ohio. It filed its income tax returns for the years 1937, 1939, 1940 and 1941 on an accrual basis with the collector of internal revenue for the eighteenth district of Ohio. The properties of the petitioner involved in this case were acquired by it during the years 1934 and 1935, and consist of two parcels of real estate located in Cleveland, Ohio, and one in New York. The properties were originally owned by the Morgan Properties Company (hereinafter *11 called Properties Company) and in 1926 the Properties Company issued ,500,000 par value of first mortgage 6 per cent serial gold bonds secured by a mortgage covering all of its properties running to The Union Trust Company of Cleveland, Ohio, as trustee for the benefit of the holders of such bonds. Prior to 1934, the properties of the Properties Company were leased to the Morgan Lithograph Company (hereinafter called Lithograph Company) which manufactured and sold lithograph materials. The rent under this lease was in an amount equal to the interest upon and the annual maturities of the bonds issued by the Properties Company, plus taxes and the operating expenses of the lessor. The Lithograph Company sustained losses from its operations for each of the four years ending June 30, 1929 to June 30, 1932, inclusive, and failed to pay rental maturing August 1, 1932. The Properties Company defaulted in payment of principal and interest due August 15, 1932 on its bonds, on which date there were outstanding $1,280,000 principal amount of such bonds. Following this default there was organized a bondholders' protective committee (hereinafter called the committee) pursuant to a bondholders *12 protective agreement dated December 1, 1932. The agreement designated The Union Trust Company, Cleveland, Ohio, as depositary and provided for the deposit of first mortgage bonds of the Properties Company with such depositary, such deposit to be evidenced by the issuance of certificates of deposit by the depositary. The agreement empowered the committee to prepare and adopt a plan and agreement for the reorganization or readjustment of the Properties Company. As of June 22, 1934, $1,236,000 par value, or 97 per cent, of the $1,280,000 par value of the outstanding bonds had been deposited under the bondholders protective agreement and all depositing bondholders assented to the provisions of such agreement. On June 3, 1933 the United States District Court at Cleveland, Ohio appointed a receiver for the Lithograph Company, the Properties Company's lessee, in the case of Model Fireproof Tenement Company v. The Morgan Lithograph Company, being equity case No. 4660 on the docket of that court. On July 1, 1933, the committee adopted a "plan of adjustment" and a copy of this plan was enclosed in a letter dated July 6, 1933, to all depositing bondholders. Pursuant to such plan the trustee *13 for the bondholders of the bonds of the Properties Company filed in the receivership proceeding involving the Lithograph Company (Equity case No. 4660), a claim for rent due the Properties Company and received three payments thereon during the year 1934 totaling $86,043.71 in cash. Non-depositing bondholders received their share of this sum in cash from the trustee while the shares of the depositing bondholders were paid to the committee for their benefit. On January 12, 1934, pursuant to the plan of readjustment, the trustee under the mortgage deed securing the bonds in the Properties Company, at the request of the committee, instituted foreclosure proceedings in the Common Pleas Court of Cuyahoga County, Ohio, being case No. 401,935 and entitled I. J. Fulton, Superintendent of Banks, etc. v. Morgan Properties Company, et al. The foreclosure proceeding covered properties of the Properties Company located in Cleveland, Ohio, and on April 13, 1934 the court entered its decree of foreclosure and foreclosed the mortgage lien securing the first mortgage bonds. The decree further provided that the properties should be sold in three groups. Group 1 consisted of the so-called Payne Avenue *14 plant of the Properties Company, moneys and credits; Group 2 consisted of the so-called East 30th Street property of the Properties Company, and Group 3 consisted of office furniture located in the New York office of the Properties Company. The Payne Avenue Plant was bid in by the committee at the foreclosure sale conducted by the Master on June 4, 1934, for a bid of $75,250, of which sum $69,145.29 was paid by a credit in that amount endorsed on the deposited bonds. The bid was satisfied and the endorsement was placed on the bonds on or about July 2, 1944. The balance of the debt represented by the bonds remained uncanceled. The difference between the bid price and the amount credited on the bonds (which difference was for court costs and other cash requirements of the foreclosure) was paid in cash from the funds which the Committee had received from the trustee for the bondholders upon distribution of the moneys received on the claim for rent against the receiver of the Lithograph Company. On June 5, 1934 the committee organized the petitioner, with an authorized capital stock consisting of 250 shares with the par value of $100 each. The members of the committee subscribed for *15 five shares of the authorized capital stock of the petitioner and thereupon caused the petitioner to enter into an agreement, dated June 11, 1934, with it providing, among other things, that the committee transfer to the petitioner its accepted bid for the properties offered under the foreclosure sale of June 4, 1934, and its right to acquire title to the properties and also all of the first mortgage 6 per cent serial gold bonds of the Properties Company then on deposit with the committee. The agreement also contained the following provisions: "1. Promptly upon request of the undersigned Committee, issue to, or upon its order, such number of certificates as the undersigned may request representing in the aggregate 150 shares of your authorized common capital stock having a par value of $100 each, including the five shares which heretofore have been subscribed on behalf of the undersigned Committee; "2. Promptly make payment of the accepted bids aforesaid and complete the purchase of said properties and the acquisition of title thereto by proper deed, bill of sale, and any other necessary instruments of transfer and conveyance, duly executed and acknowledged by George H. Martin, *16 Special Master aforesaid, subject to the taxes and special assessments and interest and penalties thereupon and to the rights of the tenant now in possession as provided in said Foreclosure Decree; "3. Assume and agree to pay forthwith or from time to time upon the demand of the undersigned Committee or its authorized representative or representatives, all of the present and future expenses, charges, liabilities and costs of the undersigned Committee, including the fees and expenses of its counsel and Depositaries, compensation payable by said Committee to dealers for securing the deposit of bonds and all of the past, present and future expenses, charges, liabilities and costs of the Committee as from time to time may be approved by the Committee for payment, and "4. Issue and deliver to or upon the written order of the undersigned Committee or its authorized representative or representatives, promptly upon such order, such of your preferential or other securities as this Committee shall specify, not exceeding however an aggregate face, or par, or agreed amount equal to the principal amount of all of the aforesaid bonds delivered to you pursuant hereto, with accrued interest thereupon *17 at the rate of 6 per cent per annum from February 15, 1932, to the date of such delivery computed semi-annually, and with accrued interest upon said interest at said rate to the date of such delivery, said securities to be bonds, debentures, notes, stocks or other securities issued by you with such character and with such preferential and secured rights as may be specified by your directors and approved by this Committee or its authorized representative or representatives." Pursuant to this agreement, the petitioner, as requested by the committee, on June 6, 1934, issued all of its 250 shares of stock to the committee's nominee, namely the depositary under the bondholders' protective agreement, and the committee, through its nominee became and remained during the years 1934 and 1935 the sole stockholder of the petitioner. The members of the committee became the officers and directors of petitioner and continued as such until the plan of readjustment was completed. On July 11, 1934, the committee assigned to the petitioner all of the $1,236.000 principal amount of bonds deposited with it together with its accepted bid for the properties sold at foreclosure on June 4, 1934, all in *18 accordance with the agreement of June 11, 1934. On July 2, 1934, the Special Master thereupon executed his Special Master's deed and bill of sale conveying the Payne Avenue Plant to the petitioner. Pursuant to its resolution dated June 13, 1934, the Committee purchased from the receiver of the Lithograph Company all of the outstanding common capital stock of Properties Company for $5.00. On July 6, 1934, it voted the stock to elect new directors and officers of its own choice. The Committee continued as the sole stockholder of Properties Company until the dissolution of the company in November, 1936. On June 17, 1934, the trustee for the bondholders (who was also the depositary under the bondholders' protective agreement) received from the receiver of the Lithograph Company a payment on account of rent owing by the Lithograph Company to Properties Company in the sum of $64,000, of which $61,600 was the amount allocable to the bonds that had been deposited under the bondholders' protective agreement. This payment of $61,600 was paid by the trustee to the committee on the same date, and on the following day, June 18, 1934, the committee deposited this amount in a bank account to *19 the credit of the petitioner. The two other payments during 1934 making up the total of $86,043.71 from this source were handled in the same manner. On June 13, 1934, the committee adopted a resolution providing that the petitioner should be directed to request the trustee under the mortgage trust deed to obtain a court order directing the Special Master to sell all of the remaining property described in the foreclosure decree. Pursuant to the resolution the Court before whom the foreclosure proceedings was pending issued a supplementary decree ordering the Special Master to proceed with the foreclosure of the mortgage lien upon the property of the Properties Company known as the East 30th Street Plant. The property was bid in by the petitioner on November 30, 1934 for a bid of $30,000, of which sum $27,096.32 was paid by a credit in that amount endorsed upon the deposited bonds. The bid was satisfied and the endorsement was placed on the bonds on or about December 11, 1934. The balance of the debt represented by the bonds remained uncanceled. The difference between the bid price and the amount credited on the bonds (which difference was for court costs and other cash requirements *20 of the foreclosure) was paid in cash from funds which the committee had received from the trustee for the bondholders upon distribution of the moneys received on the claim for rent against the receiver for the Lithograph Company. On December 11, 1934, the Special Master executed his Special Master's deed conveying the East 30th Street Plant to the petitioner. Included in and as a part of the bid of $30,000 was a bid of $7,500 for a promissory note of $13,000, payment of which was secured by a first mortgage upon residential property located on West 117th Street, Lakewood, Ohio. Later the petitioner foreclosed that first mortgage, thereby acquiring the residential property. Immediately upon its acquisition, the petitioner leased the Payne Avenue Plant to the Lithograph Company for a period of two years. In the meantime, the latter company had been reorganized in the Federal Court receivership proceeding. The Lithograph Company was given the option to purchase the property under the lease for the sum of $500,000 at any time while the lease was in effect. Such lease had been renewed and modified from time to time and the Lithograph Company is still occupying the premises under lease *21 from the petitioner with an option to purchase. In 1935 the petitioner leased the East 30th Street Plant to the Bonnar-Vawter Fanform Company, Inc., for a period of five years ending April 30, 1940, with an option in the lessee to renew the lease for an additional term of five years, and a further option in the lessee to purchase the property for an amount equal to ten times the annual rent then current. In 1937 this lessee exercised its option to purchase and the net proceeds received by the petitioner from such sale amounted to $68,550.71. In June, 1935 the Committee caused foreclosure proceedings to be brought against the mortgaged property of Properties Company situated in the State of New York. On October 30, 1935, judgment of foreclosure and sale was entered by the New York Supreme Court for the County of Kings. Its decree provided, among other things, that if the petitioner, the owner of over 96 per cent of the first mortgage bonds, should purchase the property for an amount equal to or less than the judgment debt, it should receive credit on its deposited bonds for the amount of the bid, less taxes, cost, etc., and an amount sufficient to satisfy non-depositing bondholders. *22 At the resulting foreclosure sale on November 27, 1935, the property was bid in by the petitioner for a bid of $46,000, of which sum $26,078.78 was paid by a credit in that amount endorsed on the deposited bonds, on or about December 1, 1935. The balance of the debt represented by such bonds remained uncanceled. The difference between the bid price and the amount credited on the bonds (which difference was for real estate taxes on the property involved in the sum of $18,059.64 and for court costs and other cash requirements of the foreclosure) was paid in cash from the funds which the committee had received from the trustee for the bondholders upon distribution of the moneys received on the claim for rent against the receiver of the Lithograph Company. Upon receiving title to the property by Referee's Deed executed in December, 1935, the petitioner immediately transferred it to Laundered Service, Inc. for $45,000, of which $15,000 was paid in cash and the balance represented by a bond secured by a purchase money mortgage. Properties Company, its stockholders as such and its creditors (except its bondholders) took no part in carrying out the plan of readjustment resulting in the *23 formation of Industrial Properties, Inc. None of them received any securities or other interest or right in the petitioner. All of the expenses of the foreclosure and payment to nondepositing bondholders were paid from the proceeds of the payments received on the claim for rent from the receiver of the Lithograph Company which was paid to the bondholders' protective committee and by it turned over to the petitioner. In order to acquire the properties formerly owned by Properties Company it was at no time necessary for either the committee or the petitioner to borrow any funds for the purpose of defraying any of the expenses or cash requirements in connection therewith. By direction of the committee the petitioner increased its capital stock from 250 shares of the par value of $100 each to 12,360 shares of the par value of $10 each, and thereupon converted the 250 shares into the new issue of 12,360 shares. The petitioner had only common stock and its obligation to issue shares of other classes of stock, as heretofore set forth, was canceled on September 18, 1936. Under date of October 1, 1936, the bondholders' protective committee informed each of the depositing bondholders by *24 letter of the action theretofore taken under the plan of readjustment. That letter stated, in part, that the committee, in accordance with the plan, would distribute the stock of the new corporation (the petitioner) to the holders of the certificates of deposit on the basis of one share for each $100 principal amount of bonds deposited with the committee. Shortly thereafter all of the certificates of deposit were surrendered and the committee distributed the stock of the petitioner to the certificate holders on such basis. Upon acquiring title to the various real properties of its predecessor, the Properties Company, the petitioner placed upon its books of account as its cost basis the same basis as used by the Properties Company. With respect to the Payne Avenue Plant, there were two buildings designated for convenience as the old and new building. As to the old building, the Properties Company had a cost basis of $215,187.26, and as of July 2, 1934, when title to the building was acquired by the petitioner, the Properties Company had a reserve for depreciation of $62,578.06. The Properties Company had taken depreciation for income tax purposes at the rate of 2 per cent per annum *25 on the above cost basis. The Properties Company's cost as to the new building was $54,126.55, and as of the date of acquisition by petitioner, had a reserve for depreciation of $16,616.79. The Properties Company had used a 2 per cent per annum depreciation rate on this building. With respect to the building located on the East 30th Street property, the Properties Company had a cost basis of $244,023.26, and as of December 1, 1934, the date of acquisition thereof by the petitioner, had a depreciation reserve of $42,209.80. The respondent determined that the following costs to the petitioner of the various real properties acquired by it are the proper bases for computing gain or loss and depreciation thereon in the taxable years 1937, 1939, 1940 and 1941: East 30th Street Property
Foreclosure price
$22,500.00
Accrued taxes paid
2,646.52
$25,146.52
Land
$ 2,646.52
Building
22,500.00
$25,146.52
Residence on West 117th Street, Lakewood, Ohio
Foreclosure price
$ 7,500.00
Land
$ 1,500.00
Building
6,000.00
$ 7,500.00
Payne Avenue Property
Foreclosure price
$75,000.00
Accrued taxes paid
18,238.35
$93,238.35
Machinery
$16,913.44
Land
15,264.98
Building
61,059.93
$93,238.35
*26 The record discloses the following additional facts: The fair market value of the Payne Avenue Plant in June, 1934 was $150,000, of which $95,000 was allocable to land and $55,000 to buildings. The fair market value of the East 30th Street property in November, 1934 was $75,000, of which $30,000 was allocable to land and $45,000 to buildings. In computing its gain or loss and depreciation, the petitioner adopted the book cost of the property to the Properties Company. Opinion VAN FOSSAN, Judge: The petitioner contends that the plan of adjustment constituted a reorganization under the provisions of section 112 (g) (1) of the Revenue Act of 1934, thus establishing as the petitioner's cost basis, for determining gain or loss and for depreciation purposes, the same basis as that of the Properties Company, as provided in section 113 of that Act. It further contends that in any event it is entitled to the same basis pursuant to the provisions of section 113 (a) (8) of the Act. It also asserts in the alternative that it may use as its cost basis the fair market value of the properties transferred to it as of the date of transfer and that the values so proved produced no deficiency. *27 The respondent argues that the facts before us support none of the petitioner's contentions but that the correct basis for determining the petitioner's gain or loss or depreciation allowance is the cost to it upon the acquisition of the several properties at foreclosure sales. As we understand the record, the petitioner was organized to take over the properties and business of the Properties Company, which had become involved in financial difficulties. The bondholders, through the committee and by means of the plan adopted, took charge of the company and its affairs, including the disposition of Lithograph, the parent of Properties Company. Obviously, the primary purpose of this procedure was to preserve for the bondholders as much of their investment as possible. The plan of readjustment and various actions taken pursuant thereto, were parts of a single integrated plan intended and calculated to accomplish the dominant purpose of the entire scheme. . Here, as in that case, the bondholders "stepped into the shoes of the old stockholders." They acquired the equivalent of the proprietary interest of the old *28 equity owners. . See . Through the convenient instrumentality of the committee the bondholders continued, during the various stages of the reorganization, to be in control and command of the affairs of the old company and the disposition of its properties. At the conclusion of the procedure they, as stockholders of the petitioner, stood in precisely the same position they had occupied as equitable owners of Properties Company at the inception of the plan. The intermediate steps were all in furtherance of the purpose to continue the business of the old company and its subsidiary in the best possible manner. The record shows that Lithograph Company is still occupying the main plant and has an option to purchase it. Thus, from an over all viewpoint, the record presents a situation which fits in exactly with the statutory concept of a reorganization and its resultant requirement that the basis of the property in the hands of the acquiring corporation is the same as it would have been in the hands of the transferor. See section 113 (a). Passing to the specific *29 statutes which the petitioner asserts govern its case, we find that it relies first on section 112 (g) (1). [1] The petitioner issued its voting stock to the depositing bondholders. A small percentage of the bondholders did not assent to the plan but under similar circumstances we have held that the petitioner was entitled to use its predecessor's basis for computing gain or loss. (September 28, 1945). *30 Properties Company transferred all of its assets to the petitioner through the mediuni of the committee. The petitioner issued in exchange therefor only its voting stock. This state of fact brings the transaction within the definition of section 112 (g) (1) (C). In , we held that the plan of readjustment constituted a reorganization, that the exchange came within the provisions of section 112 (b) (3) and that hence no gain or loss was to be recognized. We further held that section 112 (b) (5) was also applicable and produced the same result. In that case the respondent took a position opposite to that which he now assumes. There we sustained him. Our conclusion here is consistent with our former decision. The petitioner cites and relies on , petition for certiorari denied, , petition for rehearing denied, . We agree with the petitioner that the principles there set forth are applicable to the case at bar. As summarized in Headnote 2, they are: Where bondholders' committee bid in insolvent debtor's property *31 at foreclosure sale pursuant to plan of reorganization and transferred property to taxpayer, which was a new company, in exchange for taxpayer's shares which were distributed to bondholders, the basis of "depreciation" for income tax purposes was value of property at time of debtor's acquisition thereof and not value of property at time of transfer to taxpayer, since the transfer was pursuant to a "reorganization", even though taxpayer's shares were distributed to bondholders and not to debtor, in view of debtor's insolvency, which provided the continuity of interest of bondholders necessary for a reorganization. * * * The respondent seeks to establish his position by treating the several steps or events occurring in the development and completion of the plan as separate, distinct and independent actions, wholly unrelated to the carrying out of its underlying purpose. This view, as we have observed, is unsupported by the record, which clearly spells out an integrated plan. See The supporting cases which he cites, therefore, are not in point. The respondent also cites various cases in which considerations *32 other than voting stock were exchanged for assets of the transferor. The stipulated facts show that only voting stock was issued in the exchange and thus such cases also afford him no support. In any event, the fair market value of the properties at the date of their acquisition upon foreclosure, as we have found as a fact, is sufficient to result in no deficiency upon the controverted issue. Decision will be entered under Rule 50. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * * * *
(g) Definition of Reorganization. - As used in this section and section 113 - (1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock; of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred * * *↩